Your Honor, I'd like to reserve five minutes for rebuttal. My name is Mark Sikkim. I'm here with my co-counsel is Elizabeth Severanez, although she will not be arguing. We're here on behalf of defendants below and appellants. This case really turns on a single sentence in a very short page and a half ERISA plan, the APML plan and the definition of what is an act. That definition could not be more clear. It required that benefits under a U.S. severance guarantee benefit program will become available to eligible employees only if the company enters into a definitive agreement on or before November 1, 2015, that will result in a change of control of the company. Well, if it's that clear, why did the district court originally find it was ambiguous? Your Honor, I have to disagree with what the district court did. I think we often do have disagreements between parties and judges. I think it's a strange instruction to argue or conclude that it's ambiguous. I think that this is simply under the clear definitions that the dictionary provides for these words and simple rules of grammar that it clearly provides that the change of control has to be one that results from the definitive agreement entered into before November 1, 2015. The simple fact is that that is a restrictive clause. Yes, Your Honor. Even though there were two separate agreements and the first agreement wasn't the agreement under which the change of control actually took place, it could be that the first one caused the second one, which then caused the change of control. That is to say, it might have resulted from the first, but we've got a post hoc proctor hoc problem. How do we know that the second agreement and the change of control resulted from the first agreement? No, it did not, Your Honor. And the way this sentence is structured, it makes it clear that it has to be. I think you gave me the wrong answer. You want to say it did result. I'm sorry, Your Honor. I think you need to say that the change of control did result from the first agreement. Otherwise, you're out of court. No, Your Honor. The change of control did not result from the first agreement because that first agreement, although it was 2015, did not result in a change of control. The agreement that resulted, there was only one definitive agreement that resulted in a change of control. And it was it was not one that was entered into before November 1st, 2015. The the way this phrase appears, Your Honor, is quite clear. It limits the type. Sorry, I've got websites on the appellant, which was the least you need to argue about that. Thank you, Your Honor. People confuse Michael and I all the time. I do it constantly. So the way this phrase is written, Your Honor, that will result in a change of control. It is by any rule of grammar that is a restrictive phrase that will do something modifies and limits the words that it follows. And that means the definitive agreement entered into before November 1, 2015 has to be one that results in a change of control. Does it have to be the same agreement? Yes, Your Honor. Oh, now I do part company with you. That is to say, there may be a causal relationship between the first and the second agreement. Well, Your Honor, that would be interesting and speculative and go far afield of what a plan administrator or reviewing court could could resolve. And certainly something that neither of the parties or the court have alleged or concluded. If we think contrary to your argument, if we think that this language is ambiguous, so you're you're saying it's unambiguously favors you. I think the district court first said it was ambiguous and then said it unambiguously favors opposing counsel. If we think it's ambiguous, then what happens? Well, Your Honor, if it's ambiguous, then what we have to do under this court and the Supreme Court's precedent is defer to the reasonable determination of the plan administrator. That plan administrator reviewed plaintiff's claims and concluded that the definitive agreement that resulted in the change of control was not an initial triggering event. So it hasn't been to the district court determine what the standard of review is for the plan administrator. I thought the district court didn't address that. It did not, Your Honor, the district court's conclusion was that the administrator's decision was erroneous under any standard of review, despite, of course, initially, the district court, believing that this language was ambiguous and therefore unreasonable, people could interpret it differently. And if it's ambiguous, can't the court also examine extrinsic evidence to determine the intent of the parties? Your Honor, it certainly could, if that was something that the parties had litigated and had the opportunity to present. No party, including plaintiffs, and certainly not defendants, have ever alleged that the plan was ambiguous. So that was not an issue that was developed on the record for the district court, if in fact it were for some reason remanded. But didn't you do discovery and the defendant wasn't allowed to do discovery? Well, Your Honor, I'm sorry. I have it switched around. Your Honor, there was discovery. We opposed discovery vigorously in the district court plaintiffs demanded it. We went back and forth many times, had a couple hearings in front of our because the district court had made the statement about potentially about the plan language being ambiguous. The magistrate judge allowed discovery, at which point we commenced discovery. But three weeks later, before plaintiffs got the discovery responses and evidence that they've been fighting over, this summary judgment motion was filed, which of course led to defendant's 56D request. But Your Honor, at that point, and by the way, I should also say that a magistrate judge did allow discovery of the conflict of interest issue. But that discovery had not been done by the time the summary judgment motion was presented by plaintiffs. So the record about that and the evidence to demonstrate that there was no district court plaintiff's arguments on the conflict of interest. And this is the only way the administrator's decision would not be entitled to the highest degree of deference, given that she was given administrative and interpretive responsibility and discretion by the plan. The only way that that could be undermined is if in fact, there was a structural conflict of interest that rose to such a level that the court's skepticism in reviewing it would have to be substantial. But even then, the court would have to conclude that the administrator's decision was unreasonable. And our district judges already, at least early in the case, and we would posit when it benefited the plaintiffs in the case, argued or concluded that if despite no party asking for it, it was an ambiguous or could be an ambiguous plan. There's no evidence of that structural conflict, rising to the level that the reviewing court should consider with anything more than minimal skepticism, the administrator's assessment and interpretation. The court has repeatedly said that that level of skepticism that you bring to an abuse of discretion review, when considering an inherent structural conflict is balanced, you look at a number of factors. But what this Ninth Circuit has has pointed to in the past to demonstrate a meaningful conflict that might rise more than minimal skepticism, are the kinds of personal interest that that a administrator might have in a decision. And, for example, in the Moyle case, which was filed right about the time the plaintiffs filed their initial complaint. There, we had a director of the Human Resources Department of Liberty Mutual, who was the reviewer of the administrator, the Liberty Mutual administration benefits plan, review the denial of benefits, even though that director of HR was also on the board of directors for the administrative plan. And the court focused on the fact that there was no evidence that that administrative review that level of appellate review was in any way motivated by the administrator, making an economic assessment that was going to benefit the plan sponsor. Specifically, it turned on actuarial tables and how much those might have cost. And the evidence was the the administrator and the reviewer had not reviewed those documents. After microchip took over and put a new plan administrator in place, did that plan administrator give any deference to the decisions made by the plan administrator previously prior to microchip taking over? Your Honor, there was no plan administrator appointed. One of the beauties of having a page and a half plan, ERISA plan, which is, of course, highly unusual. But one of the beauties of it is this plan specifically said what officers of the company had authority or who could act on behalf of the company in interpreting and adjusting and deciding issues under the plan. And it said that any officer to do that had to be authorized in writing by the company. There is no authorization at all, Your Honor, there's nothing in writing that at Mel's Board of Directors that the company provided to anyone. Giving that kind of discretionary control, it simply did not exist. The first administrator appointed under the plan was by microchip after the acquisition. I see I'm already eating into my rebuttal time. Why don't we hear from the other side and then you've got some time. Thank you, Your Honor. Thank you, Michael Rubin. May it please the court. I will try to break this down into pieces to respond to each part of that and let me start by explaining why Judge Gilliam concluded that the standard of review doesn't matter, although the standard of review has to be the no vote for the reasons we stated in the brief. And let me start by explaining the context so we understand what this at Mel plan was. The Board of Directors Compensation Committee on June 25th, 2015, and this is in the 8 to 11. Recognize that once at Mel started looking for merger partner, it was going to have, and I'll quote difficulties attracting and retaining employees as a result of that speculation. And therefore it directed the four highest officers of that company to develop a severance plan that would encourage employees who would otherwise be concerned about losing their job to the new merger partner to stay with at Mel until any possible merger was consummated. Fairly straightforward reason for developing a severance plan. Then, in fact, they did develop a plan effective July 1st, just six days later, and they announced it to the employees on the record of 239 explains that the reason is to ease the concern about the potential upcoming merger. Now, at that point, at Mel had no idea whether it would affect the merger or not, but it was looking. So what is the plan itself say? Because it's the language of the plan that Judge Gilliam relied upon in granting summary judgment to the nine plaintiffs. The plan sets three conditions and only three conditions to eligibility for severance benefits. In the first place, the plan has to be in existence. So you look at the very top of the plan, it says it's in existence now starting July 1st, 2015, but it will terminate on November 1st, three months later, unless there's an initial triggering event. An initial triggering event will extend the life of the plan for 18 months. And that's the only reason there's an initial triggering event. If at Mel was making progress on finding a merger partner and actually did find a company that could merge with in that three month period, then these severance benefits that at Mel provided would be available for the 18 month period. So condition one, and that's the one that we're really focusing on is whether the plant whether there was an initial triggering event that continued the plan in existence for 18 months, then there was in fact, an initial triggering event, no disputes that there was a definitive agreement between at Mel and a company called dialogue that occurred in September. So before the November 1st deadline, that meant that going forward, the plan was in existence for 18 months following the date of that agreement with dialogue. That's the only reason the that that agreement with dialogue provided that in the event of the merger, if it being consummated, dialogue would be the surviving company. In other words, it will result in a change of control. The reason this agreement with dialogue satisfied the initial triggering event requirement is because the surviving entity would be the other company not at Mel. It's a agreement. They want to keep the employees. If at Mel is going to be the surviving entity, there's no need to provide the protection to the employees. The reason you want to protect your employees is against the new company firing them if that new company becomes a surviving partner. So the reason it says will result in is simply to make clear, and this is what Judge Gilliam held, and this is the language says to make clear that if there is a definitive agreement before November 1st, it's got to be one where the outcome is that the new company not at Mel will be the one that controls the company because that's what you have to protect your employees from. That's condition one. Condition two, very simply, the change in control has to actually occur, which it did when microchip entered into a subsequent merger agreement. And number three, because microchip fired everyone without cause, as soon as it took over, the third condition is that the employment be terminated without cause. Now, under microchips construction, there's no way any employee could possibly have known whether their jobs, sorry, whether they would be eligible for severance pay if the merger were actually affected. This condition, this is a fourth condition that microchip sought to add. It's a effectively a condition subsequent. It's asking that the triggering event, which kept this agreement alive for 18 more months, retroactively ceased to exist. If in fact, the the initial partner dialogue didn't end up being the final partner. And what that means is, under their construction, let's say dialogue, let's say there was no microchip. Let's say dialogue entered into that original agreement with Admel. And they checked before November 1, that extends it for 18 months. But then they changed one of the terms of that agreement. Let's say instead of 4.6 billion, which was what dialogue offered, they decided to change it to 4.5 billion or change something else. In that event, according to microchip, there would be no right to severance benefits for any employee, the employees would not have any protection and the whole point of the severance plan, which is to keep them on board. Once it was clear that Admel was going to enter into a merger agreement with another company that will result in the other company being the surviving entity would have had no purpose in effect. Just to ask, to clarify your hypothetical, are you contemplating that the change from 4.6 to 4.5 billion would be in a whole new agreement instead of amending the definitive agreement? Yes, if there were any, if there were any new agreement or modification to the agreement, then under microchips construction, or an agreement with a new company, modification. It just says if the definitive agreement is not your hypothetical would require a whole new agreement. Oh, no, no, no, the definitive agreement, the definitive article, the means the agreement that was entered into if there is a modification of that agreement, under the construction that microchip is offering, then there would be no right to severance. I didn't hear that construction, they were saying it was a completely different agreement. So so that's what I didn't hear any argument that a modification would prevent it from being a I guess I understand your argument, you would argue, I guess, you wouldn't actually argue, I assume you would argue that in fact, a modification doesn't alter it from being a definitive agreement. But I suppose that argument could be made. Is that what you're saying? What I'm saying is that under microchips construction, even a modification would deprive the employees of the right to Because it wouldn't be the agreement that was initial triggering effect. Okay, they don't actually make that argument. So you're just hypothesizing that they could it's the logical construction of their argument that it has to be the agreement. Now, as as Judge Schreier pointed out, there's an entirely separate set of reasons why Judge Gilliam was right. And that is because of the clause on the second the provision of the through the four executives who were charged with drafting the plan, interpret that plan or apply it in a way their construction pre merger is conclusive and binding on all persons and to be given the maximum possible deference allowed by law. Well, in fact, that's exactly what at mills for executives who drafted the plan did. And we have all that they submitted, frequently asked questions that microchip signed off on explaining that yes, regardless of whether the and they did this two days before signing the agreement with microchip, while everyone knew they were in negotiations with microchip. And what that letter says is that regardless of whether the merger partner is dialogue, or microchip, the plan remains in existence. This is past November 1. So it means they had to have perceived there have been an initial triggering event, and you'll be entitled to those severance benefits under this agreement, if the other conditions occur. So there was a definitive construction by those Mr. Rubin putting that to one side and just focusing on the text of the plan for a moment. It says a decree an agreement definitive agreement that will result. I see two possible readings of will result that will the agreement that will if consummated result, or that will inevitably result and those are two different meanings. I that's that's true. There are others like would potentially result but microchip is actually making a different one. And if you look at the briefs, they're always talking in terms of what whether it did in fact result, they're looking backward in time. So let's assume that that's let's assume that there are possible readings. And you look to the context, not just the purposes, but look, for example, of at the first condition, the first condition, this is a on the first page, a change of control actually occurs. Well, if will result means does in fact result, and that's microchips argument will result means does in fact result, that's their construction of it, then a is per pure surplus age, because that's that would say there's an initial trigger event that will result in change of control, meaning it will in fact and does in fact result in a change of control. And then the second condition is exactly the same as microchip is just offered its construction of the first a change of control actually occurs, that can't be what they meant. It doesn't protect the employees, it doesn't serve the interest. It's not the construction that at mills drafters, that the agreement itself says will be conclusive and binding if reached pre merger reached. And so therefore, whether it's a de novo standard of review, or an abuse of discretion standard of review, where you factor in the there's no other way to construe this agreement in context. And therefore, if the word will has multiple interpretations, doesn't that mean the contracts ambiguous? No, I would say no, because you have to read the language in the context of the agreement before you determine whether it's ambiguous. And although a word standing alone could be it is not ambiguous. But if it were ambiguous, all that means is that you affirm on on the alternative ground that the at mill directors, those who were declared to be fiduciaries under this agreement, because on the second page agreement, it says that the company that is at mill is the fiduciary because it's in a conclusive and binding construction that resolves any possible ambiguity over the use of the word will, and because under an abuse of discretion standard, it is an abuse of discretion, if it's either arbitrary or capricious or contrary to the plain language, even under an abuse of discretion standard, we would have to prevail. The reason that the plan administrator having discretion is because under Firestone under Kearney, in order for that decision to be discretionary, there has it has to be put exceedingly clear that the language intended to vest that discretion, and you can't for the reasons we said in the brief, have a provision that gives the at mill directors conclusive and binding discretion to construe the agreement pre merger, there is no discretion to undo that. After the merger occurs, in fact, as the reason that second clause is in there to give the at mill board the power to make a conclusive and binding agreement, construction is precisely to avoid what happened to prevent the new company, the surviving company from just firing all the employees without cause, and then saying, Oh, the severance agreement doesn't apply, we don't construe it that way. The reason that clause was in there in the agreement itself in the plan itself was so at mill could lock in its construction, to the extent there were any possibility that the word will read out of context might be perceived as an ambiguous word. What evidence is there that someone authorized to make the decision? Did so in construing the plan? Sure, sure. The evidence of that is first you look to see who is authorized. And that's in the paragraph that describes additional matters. And it defines the term company. And a company obviously can only act through its executives. And if you look to the minutes that I cited at the outset of the argument, the four principal executives of the company are the ones who were delegated the CEO, Stephen Lau, the senior HR vice president Suzanne Zumaraz, the senior vice president and CFO and senior vice president Steve Skaggs. Those are the ones Zumaraz in particular, who sent that January 14 letter who approved the the frequently asked questions. If you look at the citations in our answering brief at page 15 to 18. Those are the ones who conducted the meetings with the at mill employees to tell them that yes, this was our construction, you are protected, don't quit your jobs. Don't worry, you're protected. If you get fired without cause by the new company, you get the severance we promised. So keep working for at mill, help us get to that point where we get to the merger. And all that is in the administrative record, and has never been rebutted in the administrative record. So in terms of your review, since an ERISA case is reviewable based initially on the plain language of the plan, and then based solely on what is in the administrative record, because there is no evidence to contradict what we submitted in our claims, which is what the administrative record consists of. The only evidence supports our construction and is therefore binding and should be accepted by the court. Okay, any further questions from the bench? Thank you very much, Mr. Kosicki, you've saved some time. Good. Thank you, Your Honor. First of all, we disagree with Mr. Rubin's construction that this would have meant that an amendment to the original definitive agreement of the defendants consistently argued to the court below that that would not effectuate a change that would not change the fact that it was a definitive agreement that resulted in change of control. On number two, the Board of Directors, I'm sorry, did not do what what plaintiff's content, the authorization that the Board of Directors that plaintiffs are referring to, provided was before the plan was ever created. And it did not give discretionary authority to any of those people that plaintiffs refer to. Specifically, it said these officers, these four designated officers, could draft, finalize and fully implement a plan. Those are all settler functions, Your Honor. Those are setting it up. They are not interpreting it. No power was given to them by this setting or any other to interpret that plan. Absent that, this Susie Zamora's letter that is outside of what the district court looked at, refused to look at, and we believe inappropriate to consider, wasn't something that went to the APML employees broadly. It went to a group of people who had an additional severance plan protection, the and only one of the plaintiffs in this case got that letter, Your Honor. And Susie Zamora, who wrote it, did not have the authority under the terms of this plan to interpret the plan. Plain and simple, no document that gave it to her. We have gone far afield of what both parties have argued consistently in the district court concluded is a clear and weak defendants, although argued repeatedly, the plaintiff's theory of the case, which they pled a 502A3 claim, and this court's decision in this court's, it was a Judge Ikuda decision. Gabriel, I think you're talking about Gabriel, Gabriel. Thank you, Your Honor. In Gabriel, made it very clear how to plead and what to seek when you're trying to strike out a provision in a plan. There is plan reformation based on equitable principles. There could be a stopple. Plaintiffs refused to plead the plan was ambiguous. They refused to seek those kinds of relief despite defendants repeatedly expressing that that was what it seemed plaintiffs were trying to do by striking out the words that will result in a change of control. That's the only way of interpreting it the way plaintiffs proposed and the district court concluded. It's not appropriate. And it's certainly not relief that would be appropriate to war when the plaintiffs refused to seek that type of relief. Okay, thank you. Thank you very much. The case of Berman versus Microchip Technology Incorporated submitted for decision. We thank both sides for their very useful arguments. And we're now in adjournment. Thank you very much. Thank you.
judges: W. Fletcher, Ikuta, Schreier